# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MICHAEL D. WALLACE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 11-CV-287-PJC |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Claimant, Michael D. Wallace ("Wallace"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Wallace appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that he was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

## Background

Wallace was 42 years old at the time of the hearing before the ALJ on May 22, 2009. (R. 29). Wallace had an eighth grade education and had no vocational training. (R. 30). Wallace had worked temporary jobs and for an egg packing company. (R. 30-31). He was fired from his last permanent job for missing work. (R. 31). Wallace had a history of drug abuse, including methamphetamine, but testified that he had been clean for a couple of years. (R. 32-33). Wallace testified that he was bipolar and schizophrenic, and when he began to work steadily at a

job, he would start hearing voices and seeing things. (R. 31, 33).

Wallace testified that during a manic phase, he heard voices, didn't sleep for days, got angry, talked to people that weren't really there, and believed he was God or Jesus. (R. 33-34). He also described that during a manic phase, he had done odd things like taking all the light bulbs out of the house and dumping spices down the sink because he thought the devil was trapped inside him. (R. 36). Wallace testified that he would also self-mutilate or cut himself when manic. (R. 39).

Wallace also described hearing voices when he was in a depressed phase, particularly at night when it is quieter. (R. 34). Wallace testified that when he was depressed, he slept a lot, withdrew, and had thoughts of suicide. (R. 38). Wallace had tried to commit suicide by cutting himself with a chainsaw and injecting himself with battery acid. (R. 38). Wallace indicated he had been hospitalized seven or eight times for suicidal thoughts. (R. 38-39).

Wallace testified that he also had paranoid thoughts on a frequent basis, particularly when he would go out in public. (R. 39-40). He described always looking over his shoulder and being unable to concentrate at work due to his paranoia and checking to see if anyone was behind him. (R. 40). Regardless of whether he was in a manic or depressed phase, he described having difficulty with concentration and had "a million things racing through [his] mind at all times." (R. 40-41). This caused him to have difficulty with comprehension while watching TV or reading. (R. 41).

Wallace had sought mental health treatment, including medication and therapy, from Grand Lake Mental Health and from his physician, Dr. Mease. (R. 34-35). Wallace testified that the medication helped some, but that it did not help with the voices. (R. 36). He also indicated that side effects of the medication included drowsiness, involuntary tongue and jaw movement, and headaches. (R. 37, 43-44). Wallace testified that he had headaches three to five times per

month. *Id*. These headaches would last a day or two and Tylenol did not help. (R. 37-38).

Wallace testified that on an average day, he spent most of his time in bed, and would get up at 5 p.m., eat, and go back to bed by 7 p.m. (R. 41-43). He testified that he would sleep anywhere from 14 to 18 hours a day. (R. 39, 43). He would try to mow the lawn or wash dishes, but could never finish. (R. 41, 44). Wallace testified that he left his home about once a week to visit family. (R. 44).

Wallace indicated that he did not really have any physical problems that would limit his ability to work. (R. 41). However, he did testify that he had a lung nodule that sometimes caused difficulty breathing and he had a "weak back from not working," but opined it would probably improve with exercise. (R. 41-42). Wallace estimated that he could stand for about an hour and a half before needing to rest, walk for 30-40 minutes at a time and could sit for about an hour at a time. (R. 42). He also estimated that he could routinely lift around 50 pounds. (R. 44).

Wallace's wife, Karen Wallace,[1] also testified at the hearing before the ALJ. (R. 45-47). She testified regarding his hallucinations, his suicidal behavior, and her multiple attempts to get him involuntarily committed to a hospital for inpatient psychiatric treatment. *Id.* She also testified that she had to urge him to do things like get out of bed, bathe, take his medication, and leave the house. *Id*.

Wallace was hospitalized at Integris Grove General Hospital ("Integris") from May 16, 2005 to May 18, 2005 for nausea, vomiting, and abdominal pain. (R. 266-304). A chest CT revealed a right lung nodule that was essentially unchanged from the previous year, indicating it

---

[1] The Court notes that at the hearing, Wallace's wife was identified as Karen Wallace, however, in all other parts of the record, his wife was identified as Carolyn Bemer. (R. 26-27, 45, 95, 97, 130, 147-54, 166, 176). There is no explanation for the discrepancy and Ms. Wallace testified that they had been married for three years and had been together for 19 years. (R. 45).

was most likely benign. (R. 293). Wallace was ultimately diagnosed with inflammatory bowel disease, urosepsis,[2] and dehydration. (R. 266). Crohn's disease[3] was suspected and an outpatient colonoscopy was recommended. *Id.* The colonoscopy and a polypectomy were subsequently performed on July 12, 2005 (R. 305-22). It was ultimately concluded that Wallace had a rectal polyp of uncertain behavior. (R. 308).

Wallace presented to Integris on September 2, 2006 and was treated for a urinary tract infection and urethretis.[4] (R. 323-32). On October 26, 2006, Wallace presented to Integris with complaints of weakness, dizziness, headaches and shaking. (R. 333-45). A chest x-ray again revealed the noncalcified nodule in his right lung, and it was noted that "[g]iven stability for this period of time, greater than 2 y[ears], this is certainly compatible with a benign nodule." (R. 333). Wallace was discharged with a prescription for Cipro,[5] advised to stop smoking, and a CT scan of his chest was recommended. (R. 339-40).

Wallace was treated off-and-on at Grand Lake Mental Health Center ("GLMHC") from approximately March 1999 through 2008. (R. 196-247). The record indicates Wallace received inpatient services at the GLMHC Stabilization Center from March 11, 1999 through March 15, 1999 and from February 2, 2003 through February 5, 2003 for psychoses and polysubstance dependence. (R. 205, 238). The record also indicates Wallace received outpatient services at

---

[2] Urosepsis results from an "invasion from the urinary tract to the bloodstream by microorganisms or their products" and is "characterized by fever, chills, hypotension, and occasionally altered mental status." *Dorland's Illustrated Medical Dictionary* 1920 (29th ed. 2000).

[3] Chron's disease is a chronic inflammatory disease involving any part of the gastrointestinal tract that frequently leads to intestinal obstruction and fistula and abscess formation. *Dorland's* at 514.

[4] Urethritis is "inflammation of the urethra." *Dorland's* at 1916.

[5] Ciprofloxacin is an antibiotic. *www.pdr.net*.

-4-

GLMHC from April 1999 through May 2001 and from February 2003 through December 2006. *Id*. However, with the exception of one medication management appointment, medical records for the inpatient treatment and for the outpatient treatment from these dates were not provided. *Id*.

The first GLMHC record available was dated November 1, 2006, and Shirley Chesnut, D.O. noted that Wallace was "stable" and was "doing well on current medications. No complaint of voices or visions. No complaint of depression or suicidal/homicidal ideation." (R. 204). Wallace's medications were listed as Risperdal,[6] Zoloft,[7] and Clonidine.[8] *Id*.

On January 10, 2007, Wallace was seen again at Integris for complaints of coughing, vomiting, congestion, and urinating blood. (R. 346-54). Wallace was diagnosed with bronchitis and a urinary tract infection and prescribed an antibiotic and inhaler. (R. 349-350, 354).

On January 11, 2007, Wallace was seen at GLMHC by Theresa Page-Bohannan, M.S., LPC for an assessment and to establish a treatment plan. (R. 220-21). Wallace presented with a "clearly nervous" affect. (R. 221). Wallace's identified problems were excessive mood swings with anger and depression, psychoses, and hallucinations. (R. 220-21). Wallace indicated he was "glad to be back." *Id*.

On February 28, 2007, Wallace presented to Integris and was treated for another urinary tract infection. (R. 355-72). Later that same day, Wallace had a medication management appointment with Dr. Chesnut at GLMHC, who noted Wallace had been taken his medications as prescribed and that they were working well. (R. 203). Wallace reported no complaints of

---

[6] Risperdal is used for the treatment of schizophrenia and bipolar disorder. *www.pdr.net*.

[7] Zoloft is an anti-depressant. *www.pdr.net*.

[8] Clonidine is used to treat hypertension and may also be used to treat attention deficit hyperactivity disorder and as an adjunctive therapy to stimulant medications. *www.pdr.net*.

voices, visions, depression, or suicidal/homicidal ideation. *Id*. At a subsequent appointment with Dr. Chesnut on May 19, 2007, she again noted Wallace was "doing well" and that he had no complaints of voices, visions, depression, or suicidal/homicidal ideation. (R. 202).

On June 20, 2007, Wallace presented to Integris with complaints of vomiting, diarrhea, and abdominal cramps. (R. 378-81). He was prescribed Levsin[9] and Phenergan[10] and released. (R. 379, 381). Two months later, on August 14, 2007, Wallace presented to Integris again for abdominal pain, vomiting, diarrhea, and pain with urination. (R. 382-400). He was discharged with another prescription for Phenergan. (R. 390, 392).

On August 22, 2007, Wallace was evaluated at GLMHC by Patient Service Representative, Rikki Lancaster, B.S. (R. 205-09, 215). At that time, Wallace reported problems with sleeping, depression, anxiety, and psychosis. (R. 207). He indicated that he could "sometimes" work. *Id*. Wallace also reported that he had been out of his medications, which caused him to suffer from delusions and hallucinations. (R. 207, 215). Wallace reported his paranoia and mistrust of others interfered with his ability to make and keep friends and caused him to isolate and withdraw. (R. 207). Lancaster noted that Wallace's "mood was bizarre with blunted affect." (R. 215). Lancaster noted his diagnosis of bipolar disorder, most recent episode hypomanic, and assessed his global assessment of functioning ("GAF")[11] score at 43,

---

[9] Levsin is used to treat ulcers, irritable bowel syndrome, and neurogenic bladder and bowel disturbances. *www.pdr.net*.

[10] Phenergan may be used to prevent and control nausea and vomiting. *www.pdr.net.*

[11] The GAF score represents Axis V of a Multiaxial Assessment system. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-36 (Text Revision 4th ed. 2000) (hereinafter "DSM IV"). A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

with the highest level in the past year at 51. (R. 205). It was also noted that Wallace had a long history of mood swings, uncontrolled anger with periodic assaults, and a history of polysubstance abuse. *Id*. Lancaster also noted that Wallace's history of "compliance with treatment ha[d] been poor" and that his prognosis was "guarded. . . due to his sporadic attendance in service and inconsistent compliance with medications."[12] (R. 207).

On September 19, 2007, Wallace had a medication management appointment with Dr. Chesnut. (R. 200). She noted he had no complaints of voices, visions, depression, or homicidal or suicidal ideations. *Id*. Wallace also attended a group session on that date regarding relaxation techniques. (R. 234). At that time, his mood was listed as withdrawn with a flat affect. *Id*. On November 28, 2007, Wallace attended another group session regarding how to practice coping skills to reduce symptoms of mental illness. (R. 232).

On February 8, 2008, Wallace had a chest CT performed to evaluate his right lung nodule. (R. 401). It was noted that the "lesion [was] completely stable since . . . 5/16/05," indicating that it was "a benign process, possibly a granuloma, or small hamartoma." *Id*. There was also an "incidental note" of multiple gallstones." *Id*.

Lancaster completed another assessment of Wallace on February 13, 2008. (R. 238-42, 247). She noted that Wallace's mood was agitated with a flat affect. (R. 247). Wallace reported that his medications were no longer working as well. *Id.* Wallace also reported problems with sleep disturbance, anger, nervousness, mood swings, aggression, delusions, and hallucinations. (R. 240-41). Suicidal ideation was also noted. (R. 240). Wallace reported he was unemployed, but could "sometimes" work, and was waiting on disability approval. *Id*. His diagnosis was still listed as bipolar disorder, most recent episode hypomanic, and his GAF score was listed as 43.

---

[12] In 2007, Wallace did not show up for scheduled appointments on May 14, June 18, July 13, July 20, August 10, August 29, and October 17. (R. 212, 214, 216-19, 227, 229, 233).

(R. 238). Lancaster continued to note that his prognosis was "guarded" and that his compliance with treatment remained poor.[13] (R. 240). Wallace also attended a group session on this date concerning negative thinking. (R. 231).

Wallace also had an appointment on February 13, 2008 with Dr. Chesnut for medication management. (R. 226). Wallace reported increased depression and anxiety, but contrary to what Lancaster had noted, Wallace did not report voices or visions to Dr. Chesnut. *Id*. Dr. Chesnut increased the dosage of Wallace's medication. *Id.*

Wallace presented to Integris on February 28, 2008 with complaints of acute abdominal pain. (R. 402-16). A CT of the abdomen and a CT of the pelvis revealed recurrent acute sigmoid diverticulitis[14] and incidental cholelithiasis.[15] Wallace was discharged with directions to avoid seeds and nuts and with prescriptions of Phenergan, Cipro, and Vicodin for pain. (R. 408-09).

On September 5, 2008, Wallace presented to Darrell Mease, M.D., for prescription refills and as a follow-up of his bipolar disorder. (R. 435-37). Wallace reported a mild degree of mania and a six-week episode of depression. (R. 435). Dr. Mease noted Wallace had frequent, almost daily, symptoms of "insomnia, decreased ability to concentrate, guilt, sadness, feelings of worthlessness and tendency towards indecisiveness." *Id*. Other reported symptoms were apprehension and a feeling of impending doom. *Id*.

On September 28, 2008, Wallace reported to Dr. Mease that three days earlier, he had fainted and was unconscious for approximately two minutes. (R. 429-33). Wallace reported that

---

[13] In 2008, Wallace did not show up for scheduled appointments on February 27 and March 12. (R. 225, 246)

[14] Sigmoid diverticulitis is an inflamation of a diverticulum, which is a pouch or sac in the colon. *Dorland's* at 537, 1638.

[15] Cholelithiasis is the presence or formation of gallstones. *Dorland's* at 341.

-8-

this occurred suddenly and that he experience blurred vision and nausea prior to the occurrence. (R. 430). Dr. Mease noted that Wallace appeared tired and had a disheveled appearance. (R. 431). He also noted that Wallace appeared anxious, agitated, and paranoid, displayed psychomotor agitation and had pressured speech. *Id*.

On March 18, 2009, Wallace underwent a laparoscopic cholecystectomy[16] for his cholelithiasis and chronic cholecystitis.[17] (R. 422-25). On April 7, 2009, it was noted that his recovery was going well. (R. 421).

Nine days after the administrative hearing, Wallace was admitted to Integris for observation from May 31, 2009 to June 2, 2009 after experiencing radiating chest pain. (R. 444-50). Tests did not reveal any significant coronary artery disease and he had normal left heart pressures and normal left ventricular systolic function. (R. 447, 449-50). However, he did have "an anomalous takeoff of the nondominant right coronary artery from what appear[ed] to be the superior portion of the left main coronary artery." (R. 447, 450). He also had elevated liver enzymes and tested positive for Hepatitis C.[18] (R. 447). Wallace was discharged with instructions to increase physical activity, maintain a cardiac diet, and cease smoking. *Id*.

On July 8, 2009, Wallace was admitted to Integris for exacerbation of his diverticulitis. (R. 703-06). Wallace was discharged on July 10, 2009 after his pain was controlled and he was able to tolerate a regular diet. *Id*.

---

[16] A cholecystectomy is the surgical removal of the gallbladder. *Dorland's* at 341.

[17] Chronic cholecystitis is "inflammation of the gallbladder with relatively mild symptoms persisting over a long period." *Dorland's* at 340.

[18] Hepatitis C is a viral disease, that may be acquired via transfusion of blood products or via drug abuse. *Dorland's* at 808.

After the ALJ rendered his decision,[19] Wallace was admitted to Integris from April 13, 2010 to April 16, 2010 for a bowel obstruction. (R. 452-91, 547-48). Another chest x-ray revealed that his right lung nodule remained unchanged. (R. 490). Upon discharge, it was noted that although he had a history of bipolar disorder, Wallace was "doing quite well." (R. 453).

On April 25, 2010, Wallace was readmitted to Integris for a recurrent bowel obstruction and discharged on May 3, 2010. (R. 494-602). During his stay, it was revealed that there were several loops of ileum[20] adhered to a perforation of his sigmoid colon, which ultimately required an ileostomy,[21] performed by Douglas Ohlstrom, M.D. (R. 495, 591-93). Wallace was discharged with medication and home health nursing to assist with dressing changes and ileostomy care. (R. 495, 723).

On May 16, 2010, Wallace presented to Integris with complaints of abdominal pain and blood in his ileostomy. (R. 606-16). Dr. Ohlstrom was consulted and indicated there was nothing to worry about. (R. 616). Wallace presented to Integris again on three separate dates in July and August 2010 with complaints of abdominal pain and diarrhea. (R. 617-42). During these visits, there was no evidence of bowel obstruction and Wallace was discharged with diagnoses of diverticulitis and colitis and instructed to rest, continue taking his medication, and follow-up with his doctor as needed. *Id*.

On July 21, 2010, Dr. Ohlstrom wrote a letter stating that as a result of Wallace's

---

[19] Although these records are outside the relevant time frame and were not available to the ALJ, this Court has included the new evidence in its consideration of whether substantial evidence supports the ALJ's decision. "[W]e must consider the entire record, including [the newly submitted] treatment records, in conducting our review for substantial evidence on the issues presented." *Martinez v. Barnhart*, 444 F.3d 1201, 1208 (10th Cir. 2006).

[20] Ileum is the distal portion of the small intestine. *Dorland's* at 875.

[21] An ileostomy is the surgical creation of an opening into the ileum and abdominal wall. *Dorland's* at 875, 1703.

extensive surgery for bowel obstruction and his ileostomy, he anticipated Wallace would "need multiple surgeries in the future before his complete recovery is to be obtained." (R. 604).

On September 24, 2010, Wallace underwent a colonoscopy at Integris. (R. 649-67). Results revealed:

> changes consistent with a defunctionalized colon; however, in the ascending colon and descending colon there was marked erythema,[22] although no actual ulcerations. . . There were multiple diverticula and some narrowing of the sigmoid colon noted.

(R. 651). Wallace subsequently presented to Integris on October 1, 2010 with complaints of abdominal pain since the colonoscopy. (R. 668-77). Wallace was instructed to consume a clear liquid diet, use a heating pad, and continue his medication. (R. 672).

On October 10, 2010, Wallace was seen at Tahlequah City Hospital for complaints of abdominal pain. (R. 728-30). Tests revealed sigmoid colitis or diverticulitis, but no obstruction. (R. 729-30).

Wallace did not have any agency consultative examinations. On November 11, 2007, non-examining agency consultant Sally Varghese, M.D., completed a Psychiatric Review Technique form and found insufficient evidence of a medically determinable impairment. (R. 182-94). Dr. Varghese noted that she was unable to assess the severity of Wallace's impairments because his medical source had not responded to a request for information and because Wallace had not shown up for two scheduled appointments for an agency mental status exam. (R. 194).

Non-examining agency consultant Burnard Pearce, Ph.D., completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment on June 10, 2008. (R. 248-65). Dr. Pearce marked that Wallace had an affective disorder, evidenced by both depressive and manic symptoms. (R. 248, 251). In the "Consultant's Notes" section, Dr. Pearce

---

[22] Erythema is redness produced by congestion of the capillaries. *Dorland's* at 617.

-11-

noted that Wallace had not shown up for another scheduled mental status exam and had not responded to a follow-up phone call or letter. (R. 260). Dr. Pearce briefly reviewed records from GLMHC, describing delusions, hallucinations, paranoia, and isolation. *Id*. Dr. Pearce also noted that Wallace had a history of substance abuse as well as non-compliance with treatment and medication. *Id*.

On the Mental Residual Functional Capacity Assessment form, Dr. Pearce found that Wallace was markedly limited in his ability to understand, remember, and carry out detailed instructions. (R. 262). Dr. Pearce also found that Wallace was markedly limited in his ability to interact appropriately with the general public. (R. 263). No other limitations were found. (R. 262-63). In summary, Dr. Pearce opined that Wallace could "perform simple tasks with routine supervision," "relate to supervisors and peers on a superficial work basis," "cannot relate to the general public," and "can adapt to a work situation." (R. 264).

## Procedural History

On June 21, 2007, Wallace filed applications for disability insurance benefits and for supplemental security income under Titles II and XVI, 42 U.S.C. §§ 401 *et seq.* (R. 11, 95-102). Wallace alleged the onset of his disability began June 20, 2007. (R. 95, 100). The applications were denied initially and on reconsideration. (R. 54-57). A hearing before ALJ Charles Headrick was held May 22, 2009 in Tulsa, Oklahoma. (R. 25-53). By decision dated July 16, 2009, the ALJ found that Wallace was not disabled. (R. 11-18). On March 17, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any

-12-

substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[23] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to

---

[23] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520©. If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.* (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Wallace met the insured status requirements through September 30, 2008. (R. 13). At Step One, the ALJ found that Wallace had not engaged in any substantial gainful activity since his alleged onset date of June 20, 2007. *Id*. At Step Two, the ALJ found that Wallace had a severe impairment of bipolar disorder. *Id*. At Step Three, the ALJ found that Wallace's impairments, or combination of impairments, did not meet a Listing. (R. 13-14).

After reviewing the record, the ALJ determined Wallace had the RFC to perform a range of medium work, with the exception of his ability to "perform simple tasks with routine supervision, relate to supervisors and peers on a superficial work basis, cannot relate to the general public, and can adapt to a work situation." (R. 14). At Step Four, the ALJ found that Wallace was capable of performing his past relevant work as an egg packer. (R. 17). In the alternative, the ALJ found that Wallace was not disabled at Step Five and identified other jobs in the national economy that Wallace could perform. (R. 17-18). Therefore, the ALJ found that Wallace was not disabled from June 21, 2007 through the date of his decision. (R. 18).

## Review

Wallace asserts that the ALJ erred by failing to perform a proper determination at Steps Four and Five, and failing to perform a proper credibility determination. Regarding the issues raised by Wallace, the undersigned finds that the ALJ's decision is supported by substantial

evidence and complies with legal requirements.  Therefore, the ALJ's decision is affirmed.

**Steps Four and Five**

Wallace's argument regarding Steps Four and Five is his objection to the hypothetical given to the vocational expert ("VE").  Instead of actually stating out loud what physical and mental limitations he wanted to include in the hypothetical, the ALJ merely referred to the Mental Residual Functional Capacity Assessment of Dr. Pearce and asked the VE to assume that Wallace had the RFC "to perform a full range of medium work, that he ha[d] functional or mental limitations as set out in [Dr. Pearce's assessment]."  (R. 49, 262-64).  In general, this Court disapproves of this method of propounding a hypothetical to the VE:

> A complete question paired with a complete answer in the transcript is highly desirable. . . [The shortcut of using forms] too often leaves the reviewing court with difficulty in determining if the people sitting in the hearing room all were asking questions, giving testimony, and listening to testimony regarding the same hypothetical RFC.

*Sitsler v. Astrue*, 410 Fed. Appx. 112, 120 n. 4 (10th Cir. 2011) (unpublished).  Nevertheless, the use of forms as a way of propounding the hypothetical to the VE has not been ruled by the Tenth Circuit to be a *per se* fatal error by an ALJ, and this Court declines to proclaim such a rule. Moreover, Wallace does not give examples of any prejudice he suffered as a result of the ALJ's questioning of the VE.

As described earlier in this Opinion and Order, Dr. Pearce found that Wallace could "perform simple tasks with routine supervision," could "relate to supervisors and peers on a superficial work basis," could not "relate to the general public," and could "adapt to a work situation."  (R. 264).  The hypothetical, as it encompassed Dr. Pearce's assessment, is entirely consistent with the ALJ's ultimate RFC determination that Wallace had the RFC to perform medium work, with the exception of his ability to "perform simple tasks with routine supervision, relate to supervisors and peers on a superficial work basis, cannot relate to the

-15-

general public, and can adapt to a work situation."  (R. 14).

Wallace argues that the ALJ failed to give specific exertional abilities in his hypothetical to the VE.  This argument has no merit, particularly where there is no evidence of any exertional limitations and Wallace specifically claimed he had no physical impairments that prevented him from working.  (R. 41-43).  The exertional requirements of medium work are defined at 20 C.F.R. §§ 404.1567(c) and 416.967(c) and the Tenth Circuit has affirmed cases where the ALJ used the defined exertional levels, rather than listing each component of the defined level, as part of the hypothetical asked of the VE.  *Qualls v. Astrue*, 428 Fed. Appx. 841, 850-51 (10th Cir. 2011) (unpublished);[24] *Rutledge v. Apfel*, 230 F.3d 1172, 1175 (10th Cir. 2000).  The Court finds that it would be an unwarranted formality to require the ALJ to state all of the components that together are defined as medium work.  *See Fischer-Ross v. Barnhart*, 431 F.3d 729 (10th Cir. 2005); *Westbrook v. Massanari*, 26 Fed. Appx. 897, 903 (10th Cir. 2002) (unpublished) (requirement of establishing demands of previous work at Step Four was not intended "to needlessly constrain ALJs by setting up numerous procedural hurdles that block the ultimate goal of determining disability"); *Wall v. Astrue*, 561 F.3d 1048, 1068-69 (10th Cir. 2009) (remand when ALJ completed extensive analysis of medical evidence would result in "needlessly prolonging" proceedings).  There was no error in the way the ALJ described the exertional abilities in the hypothetical to the VE.

**Credibility**

Credibility determinations by the trier of fact are given great deference.  *Hamilton v.*

---

[24] In *Qualls*, the VE did specifically testify that she was familiar with the exertional requirements of work activity.  428 Fed. Appx. at 850.  That would be the better method, however, in the present case, the VE did at least show familiarity with the exertional requirements in her testimony in describing Wallace's past relevant work.  (R. 49).  *See id.* at 850 n. 9.

*Secy. of Health & Human Servs.,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186. Some of the factors the ALJ may consider in assessing the credibility of a claimant's complaints include "the levels of medication and their effectiveness, the extensiveness of the attempts. . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." *Kepler*, 68 F.3d at 391 (quotation and citation omitted).

In his decision, the ALJ found that Wallace's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."[25] (R. 17). While the ALJ's credibility assessment was minimal, the Court finds it adequate. *Cobb v. Astrue*, 364 Fed. Appx. 445, 450 (10th Cir. 2010) (unpublished) (while ALJ's credibility assessment was summary, taking the decision as a whole, the ALJ's findings regarding the claimant's testimony were "clear enough" without violating rule against *post hoc* justification). Although the ALJ could have been more detailed in his credibility analysis, he did set forth sufficient and specific reasons

---

[25] Wallace faulted this language as meaningless boilerplate, but this sentence was merely a summary of the ALJ's analysis and was not harmful. *See Kruse v. Astrue*, 436 Fed. Appx. 879, 887 (10th Cir. 2011) (unpublished) ("boilerplate language is insufficient to support a credibility determination only in the absence of a more thorough analysis") (quotation omitted).

for his finding that Wallace lacked credibility. In making his credibility determination, the ALJ summarized Wallace's testimony and the testimony of his wife, discussed the medical evidence, and gave specific reasons for finding Wallace not credible. (R. 15-17).

The ALJ discussed Wallace's medical records, including the fact that he missed numerous appointments, and was evaluated by his treating psychiatrist as "stable" at the appointments he did attend. (R. 16). The ALJ's reliance upon the inconsistency between this medical evidence and Wallace's complaints is a specific reason for finding Wallace less than credible. (R. 17). *See* 20 C.F.R. § 404.1529(c)(4) ("we will evaluate your statements in relation to the objective medical evidence"). A finding that the objective medical evidence is inconsistent with the claimant's allegations of disabling pain is a legitimate factor for an ALJ to consider in making a credibility assessment. *Kepler*, 68 F.3d at 391 ("consistency or compatibility of nonmedical testimony with objective medical evidence" is one factor that an ALJ should consider in assessing credibility). The ALJ did not rely solely on a lack of corroborating objective medical evidence, but relied on other factors as well. *See Kruse*, 436 Fed. Appx. at 886.

In addition to the legitimate reason of citing provisions of objective medical evidence that contrasted with Wallace's claims of disabling mental symptoms, the ALJ specifically examined the credibility factors set forth by SSR 96-7p, including activities of daily living, factors that precipitated and aggravated symptoms, medication taken to alleviate symptoms, and treatment obtained for relief, as well as his history of substance abuse. (R. 16-17).

Wallace lists several pieces of evidence that the ALJ "ignored." A claimant made a similar argument in a Tenth Circuit case, listing "certain pieces of favorable evidence." *Stokes v. Astrue*, 274 Fed. Appx. 675, 685-86 (10th Cir. 2008) (unpublished). The Tenth Circuit said that the only question it needed to consider was whether the ALJ's adverse credibility assessment

"was closely and affirmatively linked to evidence that a reasonable mind might accept as adequate to support that conclusion." *Id.* at 686. The Tenth Circuit found no reason to overturn the ALJ's credibility determination. *Id. See also Korum v. Astrue*, 352 Fed. Appx. 250, 253-54 (10th Cir. 2009) (unpublished) (ALJ's opinion was thorough, and evidence not mentioned by the ALJ was not of such quality as to require discussion). This Court also finds that the ALJ's credibility assessment was closely and affirmatively linked to evidence that supported the conclusion that Wallace was not fully credible.

Wallace also criticizes the ALJ's credibility determination of his wife's testimony. The ALJ found that her "testimony [was] diminished substantially because of the spousal relationship and a desire to support the claimant. The claimant's lack of support for his mental status allegations also affects his wife's credibility." (R. 17). This credibility determination is also entitled to deference when supported by substantial evidence. *See Adams v. Chater*, 93 F.3d 712, 715 (10th Cir. 1996). First, it is worth noting that the Tenth Circuit does not require the ALJ to make a specific credibility determination of every witness, including a claimant's spouse. *Id*. ("We decline claimant's invitation to adopt a rule requiring an ALJ to make specific written findings of each witness's credibility, particularly where the written decision reflects that the ALJ considered the testimony."). Nonetheless, the undersigned finds that substantial evidence supports the ALJ's credibility determination regarding Ms. Wallace's testimony. It was proper for the ALJ to consider the spousal relationship and the lack of corroborating evidence as factors in assessing her credibility. *Kepler*, 68 F.3d at 391 (Relevant factors include "the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.") (quotation omitted).

Wallace's multiple arguments regarding the ALJ's credibility assessment constitute "an invitation to this court to engage in an impermissible reweighing of the evidence and to

substitute our judgment for that of the Commissioner," and the undersigned declines that invitation. *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005); *see also Miller ex rel. Thompson v. Barnhart*, 205 Fed. Appx. 677, 681 (10th Cir. 2006) (unpublished) (claimant disputed ALJ's view of evidence and relied on other evidence, but court declined to reweigh evidence).   All of Wallace's arguments are essentially that Wallace would like for this Court to give more weight to the evidence that is in his favor and less weight to the evidence that disfavors his claim of disability.

> The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.  We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.

*Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations, quotations, and brackets omitted). The ALJ's credibility determination was supported by specific reasons linked to substantial evidence, and the undersigned therefore finds that it should be affirmed.  *Mann v. Astrue*, 284 Fed. Appx. 567, 571 (10th Cir. 2008) (unpublished) (finding credibility determination adequate when ALJ discussed three points).

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED**.

Dated this 13th day of September 2012.

_____
Paul J. Cleary
United States Magistrate Judge